**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DORIS TORRES<br><br>  Plaintiff,<br><br>v.<br><br>RIVERSTONE RESIDENTIAL, JOHN DOES (1-10), JANE DOES (1-10), ABC CORPORATIONS (1-10), ABC, LLC (1010), ABC, LLP (1-10), *jointly, severally, individually,*<br><br>  Defendant. | Civ. Action No. 10-79 (KSH)<br><br><br>**OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

Plaintiff Doris Torres was terminated from her employment as an assistant property manager with defendant Riverstone Operating Company, Inc. ("Riverstone"). She then brought this action, alleging that in firing her, Riverstone committed a breach of contract, violated the implied covenant of good faith and fair dealing, and made fraudulent and negligent misrepresentations. Riverstone has moved for summary judgment on all of Torres's claims and for sanctions on the grounds that her claims are frivolous and her continued pursuit of them has unreasonably multiplied the proceedings in this Court.

**I. Facts**

Torres began working for Riverstone in 2002, and in August 2006, she became a property manager for the Riverstone-managed Curling Club Apartments in Hoboken, New Jersey. (Compl. ¶ 3; Torres Dep. 22:2–7, 25:1–26:2.) She never signed an employment contract with Riverstone, and she concedes that her employment with Riverstone was at will. (Torres Dep.

75:24–76:12.)  She did, however, receive an Associate Handbook ("Handbook") and sign an

Associate Handbook Acknowledgment Form ("Acknowledgment").  The Acknowledgment

contains the following language:

> By signing this Acknowledgment, I hereby agree that I am an "at will" Associate .
> . . . [T]he Company and I both have the right to terminate the employment
> relationship at any time, for any reason, with or without cause or notice.
>
> I understand that the *Associate Handbook* is a general guide only and that the
> provisions of the Handbook in no way constitute an employment contract or
> guarantee employment.  I also understand that any contracts relating to my
> employment must be in writing and signed by the Chief Executive Officer of the
> Company.  (Stanton Certif. Ex. C.)

The Handbook itself exceeds fifty pages in length.[1]  Directly after the introduction is a

paragraph prominently titled "EMPLOYMENT AT WILL."  (Handbook, attached to Roberts

Certif. as Ex. 5, at 6.)  It states that "[i]t is the right of the Company and Associate to terminate

the employment relationship at any time for any reason, with or without notice or cause.  All

Associates of the Company are hired under the employment at will doctrine unless otherwise

specified in a written, approved and executed employment contract or collective bargaining

agreement."  (*Id*.)  Later, the Handbook details Riverstone's termination policies.  (*Id.* at 51.)

Under the subtitle "*Discharge/Dismissal*," the Handbook reads, "A discharge or dismissal occurs

when an Associate is terminated by the company due to poor work performance, unacceptable

conduct, or a violation of Company policies and procedures."  (*Id*.)

The Handbook also details a procedure called "maximizing associate performance"

("MAP").  (*Id.* at 49.)  MAP is, in effect, a disciplinary system "whereby the supervisor and the

Associate work as a team to promote effective performance and positive behavior in the

---

[1] Torres and Riverstone have provided excerpts of the Handbook that appear to come from different revisions of the
Handbook.  For example, page 51 of the Handbook excerpted by Riverstone corresponds to page 50 of the
Handbook excerpted by Torres.  The substance of the Handbook does not appear to vary from one excerpt to the
other, and neither party quibbles with the other's excerpts.  Therefore, all citations to the Handbook refer to the
pagination of the version submitted by Torres.

workplace." (*Id.*)  Under the system, the employee is essentially rehabilitated under the tutelage

of a superior.  Its procedures remain flexible, and the "supervisor is responsible for determining

which steps in the MAP process will be utilized and what corrective action will be taken at any

time." (*Id.*)  The disciplinary action a supervisor may take includes anything from a written

advisory to termination.  (*Id.* at 49–50.)

Torres's responsibilities at the Curling Club included managing the property and

employees, keeping track of budgeting and expenses (though she did not have the final say in

financial matters), "ensuring repairs were made around the property[,] and dealing with tenants."

(Torres Dep. 23:10–25:8.)  Her supervisor, from December 2008 until her termination, was

Lindsey Geitz.  (Torres Dep. 34:2–5.)

Emails from Torres's superiors, co-workers, and Curling Club residents reflect a number

of complaints about her performance.  On June 4, 2008, Torres received an email from Margaret

Garrity—a representative of PNC Realty Investors, the owner of the property—inquiring about a

two-week delay in the payment of an invoice.  (Email from Garrity to Torres dated June 4, 2008,

attached to Stanton Certif. as Ex. D.)  One month later Garrity emailed Torres again, this time

asking about an error that caused security deposits to be posted to the Curling Club's accounts

receivable.  (Email from Garrity to Torres dated July 14, 2008, attached to Stanton Certif. as Ex.

E.)  On September 8, 2009, Tina Rider, PNC Realty Investors' Vice President for Asset

Management, copied Torres on an email to Geitz inquiring about a large anomaly in the Curling

Club's August financial numbers.  (Email from Rider to Geitz, attached to Stanton Certif. as Ex.

F.)  Riverstone also states that it received summonses to appear in Court because Torres failed to

return security deposits to tenants in a timely fashion, and that Torres repeatedly failed to timely

submit invoices for payment and incorrectly submitted other invoices.  (Def.'s Statement of

Material Facts ¶¶ 16–18.)  Torres denies that any mistakes were her fault, stating that other Riverstone employees were to blame, that she is not responsible for supervising the accounting staff, and that she does not have the final say over budget issues.  (Pl.'s Statement of Material Facts ¶¶ 4, 7–10, 16–18.)  She also states that during her time at Riverstone, she was unaware of any complaints the Curling Club's owner made against her.  (*Id.* ¶ 6.)

Other Riverstone employees took issue with Torres's performance, as well.  Melissa Davis, an employee who had been fired by Torres, emailed Geitz in late June 2009 to complain about Torres's conduct.  (Email from Davis to Geitz, attached to Stanton Certif. as Ex. G.)  In the email, she accused Torres of calling her house "with a very abusive tone," repeatedly threatening to fire or replace her, and harassing her on most of her days off for an entire year.  (*Id.*)  In August 2009, Joan Aronowitz, a floating property manager for Riverstone, inspected the Curling Club and emailed her report to Geitz.  (Email from Aronowitz to Geitz, attached to Stanton Certif. as Ex. H.)  In the report, Aronowitz stated, "I don't know where to begin . . . this place is a mess!"  (*Id.*)  After describing some maintenance and auditing issues, Aronowitz wrote that "things are way out of hand over here," and that "Doris . . . is making the mistakes."  (*Id.*)  Also in August 2009, Daniela Lopez, Torres's subordinate, emailed Geitz to complain that Torres had made her work from home without pay on her days off.  (Emails from Lopez to Geitz, attached to Stanton Certif. as Ex. I.)  Torres flatly denies each of these allegations and states that she was not aware of any of them until her deposition on July 1, 2010.  (Pl.'s Statement of Material Facts ¶¶ 11–14.)

The record reflects that some of the Curling Club's residents had issues with Torres.  On January 20, 2009, Maura Bilafer, a Riverstone Vice President, received a phone call from a tenant's mother who complained that Torres was rude to her on the phone and hung up on her.

4

(Email from Bilafer to Geitz dated Jan. 20, 2009, attached to Stanton Certif. as Ex. N.)  In an email recounting the phone call, Bilafer stated to Geitz, "I know you are aware that customer service is not a strong point with Doris" and noted that "Doris is all over" a Hoboken blog discussing residential properties "for bad customer service."  (*Id.*)  Two days later, a Curling Club resident named Dana Graziano emailed Torres, and copied Bilafer, to tell Torres that she was upset at the "unprofessional" manner in which Torres handled a maintenance issue and that she felt "neglected" because Torres did not attend a meeting with the resident and the Curling Club's maintenance manager.  (Email from Graziano to Torres, attached to Stanton Certif. as Ex. O.)  On April 1, 2009, resident Jason Ellis emailed Geitz to tell her that Torres was not giving him clear answers about terminating his lease and that he was "disappointed."  (Email from Ellis to Geitz, attached to Stanton Certif. as Ex. P.)  Torres denies that any residents complained about her on the grounds that no one from Riverstone ever disclosed the complaints to Torres, and she also points out the Graziano told Torres she was appreciative that Torres set up the meeting with maintenance.  (Pl.'s Statement of Material Facts ¶¶ 20–23.)

On July 9, 2009, Geitz emailed Torres a written advisory pursuant to the MAP process. (July 9, 2009, Written Advisory, attached to Stanton Certif. as Ex. U.)  In it, Geitz detailed some concerns she had with Torres's performance, noting that some residents had complained that Torres was rude and unwilling to help them and that Torres had not adequately completed her upkeep of the building.  (*Id.*)  The advisory referenced an email Geitz had sent to Torres in February 2009 listing a set of tasks for her to perform and expectations Geitz had for her, many of which she failed to address.  (*Id.*; Email from Geitz to Torres, attached to Stanton Certif. as Ex. T.)

At the end of July, Riverstone tested Torres with an "audio shop," an exercise during which a representative of a third-party vendor—called a "shopper"—either calls or physically visits a Riverstone property, poses as a customer, and rates the level of service provided by the Riverstone associate.  (Def.'s Statement of Material Facts ¶¶ 33–34.)  The associate receives a score based on criteria listed on a form the shopper fills out.  Because the criteria are subjective, Riverstone management records and listens to telephone audio shops to verify whether the associate performed up to expectations.  (Geitz Dep. 23:19–24:1.)  On the July 2009 audio shop report, Torres scored a 79.4%.  (Stanton Certif. Ex. V.)  According to Geitz, "Riverstone's benchmark is ninety percent," and "anything below eighty percent is an automatic write-up." (Geitz Dep. 14:4–7.)  Therefore, Geitz emailed Torres and told her that her performance on the audio shop did "not meet the Riverstone standard of 80%," to which Torres replied that she would try harder next time.  (Emails of Aug. 31, 2009, attached to Stanton Certif. as Ex. Y.)

On August 17, 2009, Riverstone conducted a property audit of the Curling Club to ensure the quality of the management of its properties.  (Def.'s Statement of Facts ¶ 36.)  As with the audio shops, Riverstone's expectation on audit reports is a score of 90% or greater, with scores below 80% triggering an automatic write-up.  (Aug. 6, 2009, Meeting Agenda, attached to Stanton Certif. as Ex. X.)  Torres scored a 62.9% on the audit report, and Geitz accordingly emailed her a second MAP written advisory, in which she told Torres that "Doris should strive for meeting the benchmark which is a 90% or above.  It is a requirement of her position to receive an 80% or above."  (Aug. 17, 2009, Written Advisory, attached to Stanton Certif. as Ex. W.)

Thereafter, on September 8, 2009, Torres accepted the lesser position of assistant property manager at the Curling Club.  (Torres Dep. 20–22.)  She voluntarily accepted the new

position after Geitz told her "that she was not fulfilling [Geitz's] needs as a Property Manager and not hitting the benchmarks that Riverstone set forth and told her that [Geitz] was going to have to make a change." (Geitz Dep. 10:14–18.)

One month later, on October 15, 2009, Torres completed another audio shop and scored an 81.3%. (Oct. 15, 2009, Audio Shop Report, attached to Stanton Certif. as Ex. Z.) While the shopper noted that Torres seemed enthusiastic, friendly, and professional, he also stated that "Doris did not ask about any of my needs." (*Id.*) In addition, Riverstone's Regional Trainer, Patrick Nugent, listened to the audio tape of the call and said that Torres "did not sound very friendly or enthusiastic with this phone call" and that "[t]he shopper sounds like they are trying to pull information out of us." (Email from Nugent to Raper and Geitz, attached to Stanton Certif. as Ex. AA.) Geitz also listened to the tape and stated that the shopper "was far too kind" and that the call "was horrible from beginning to end and . . . definitely demonstrated poor work performance." (Geitz Dep. 23:5–9; 37:13–18.) Torres herself admitted that the call "[c]ould have been handled better," though she also insisted that she was distracted by having to train a new property manager. (Torres Dep. 90:1–5.)

On October 21, 2009, Torres received a final MAP form, which terminated her employment with Riverstone. (Termination Notice, attached to Stanton Certif. as Ex. FF.) It noted that although she received an audio shop score "just barely over the passing mark . . . the contents failed to meet company standards on how to handle a prospective resident sale." (*Id.*) It also noted that "Doris has received previous warnings regarding her performance and we recently demoted her to Assistant Property Manager in an effort to overcome deficiencies." (*Id.*) The second page of the notice listed previous actions taken, including the MAP advisories from July 10 and August 17 and Torres's demotion to assistant property manager on September 8.

(*Id.*)  While Torres asserts that she was fired simply for scoring an 81.3% on the October 15 audio shop[2] (*e.g.*, Pl.'s Statement of Material Facts ¶ 42), Geitz stated that "after giving [Torres] opportunity after opportunity at this point through . . . various write-ups, various discussions, a demotion and lots of conversation around what expectations need to be, I could no longer afford to have her.  And I was very clear [when telling Torres she was fired] to say this shop report, yes, is like the final straw, but it is not the reason you're really getting terminated right.  I mean, this is a culmination of things."  (Geitz Dep. 45:17–46:5.)

Torres filed a three-count complaint in the Superior Court of New Jersey on November 24, 2009.  [D.E. 1-1.]  The first count alleges a breach of contract, and states that "defendants breached plaintiff's employment contract and wrongfully failed to judge plaintiff on the basis of merit and ability and wrongfully and without cause terminated Plaintiff."  (Compl. Count One ¶ 4.)  The second count alleges a breach of the implied covenant of good faith and fair dealing, and the final count alleges that Riverstone made "material negligent misrepresentations to the plaintiff and others including but not limited to the representation that 80% is a passing score and not poor work performance, that the July 10, 2009 [MAP] was only a tool for guidance and not a disciplinary action . . . but Defendant[] used passing score on the Industry Audio test as a basis for her termination."  (*Id.* Count Two ¶ 3, Count Three ¶ 2.)  Riverstone removed to this Court on diversity grounds, *see* 28 U.S.C. §§ 1332, 1441, 1446, and subsequently filed the instant motions for summary judgment [D.E. 19] and for Sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927 [D.E. 20].

## II. Riverstone's Motion for Summary Judgment

[2] This assertion is the product of Torres's belief that when she accepted the assistant manager position, the slate was wiped clean, such that Riverstone neither would nor could take her prior mistakes into account when considering whether to discipline her.  Therefore, she argues, Riverstone's decision to terminate her was based only on her performance as assistant property manager, and the only measure of that performance was the October 15 audio shop.  This position is not supported in the record, and Torres cites no law to buttress it.  In short, it is meritless.

8

### A. Summary Judgment Standard

Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for summary judgment, the court must draw "all reasonable inferences from the underlying facts in the light most favorable for the non-moving party." *Battaglia v. McKendry*, 233 F.3d 720, 722 (3d Cir. 2000). The role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "A factual dispute is material if it bears on an essential element of the plaintiff's claim, and is genuine if a reasonable jury could find in favor of the nonmoving party." *Fakete v. Aetna*, *Inc.*, 308 F.3d 335, 337 (3d Cir. 2002) (citations omitted).

### B. Breach of Contract

In support of its motion for summary judgment, Riverstone argues that Torres was an at-will employee, subject to termination at any time, with or without notice or cause. (Moving Br. at 7–8.) Torres, however, contends that the Handbook contains a promise that Riverstone's employees could not be fired after scoring higher than an 80% on an audio shop. (Opp'n Br. at 21.) Riverstone counters that the Handbook made no such promise and that it clearly and conspicuously disclaimed any promise of continued employment. (Moving Br. at 6–7, 8–10.)

Torres correctly points out that under certain circumstances "[a]n employment manual may alter an employee's at-will status by creating an implied contract between an employer and employee." *Wade v. Kessler Institute*, 172 N.J. 327, 339 (2002) (citing *Woolley v. Hoffman-La Rouche, Inc.*, 99 N.J. 284 (1985), *modified on other grounds*, 101 N.J. 10 (1985)). The New

Jersey Supreme Court held in *Woolley* that "absent a clear and prominent disclaimer, an implied promise contained in an employment manual that an employee will be fired only for cause may be enforceable against an employer even when the employment is for an indefinite term and would otherwise be terminable at will." *Woolley*, 99 N.J. at 285-86.  In *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385 (1994), the Court set forth the test for determining whether an employment manual creates an enforceable obligation, stating that

> [T]he basic test for determining whether an employment contract can be implied turns on the reasonable expectation of the employees.  A number of factors bear on whether an employee may reasonably understand that an employment manual is intended to provide enforceable employment obligations, including the definiteness and comprehensiveness of the termination policy and the context of the manual's preparation and distribution.

*Witkowski*, 136 N.J. at 393.

Despite the Court's emphasis on "reasonable expectations," the question of whether an employment manual can be construed as an enforceable contract is a question of law for the court to decide on summary judgment "when no reasonable juror could reach other than one conclusion." *Troy v. Rutgers*, 186 N.J. 354, 366 (2001).  As suggested by the Court in *Woolley*, the employer may shield itself from implied obligations by including a "clear and prominent disclaimer." *Woolley*, 99 N.J. at 285.  Although there exists no rubric outlining the essential language of an effective disclaimer, it must make clear to the employee that "the employer continues to have the absolute power to fire anyone with or without cause." *Id*. at 309.  This "appropriate statement" must be presented in "straightforward terms," and must avoid "confusing legalese." *Preston v. Claridge Hotel & Casino, Ltd*., 231 N.J. Super. 81, 87 (App. Div. 1989); *Woolley*, 99 N.J. at 300.  In *Woolley*, the Supreme Court stated,

> All that need be done is the inclusion in a very prominent position of an appropriate statement that there is no promise of any kind by the employer contained in the manual; that regardless of what the manual says or provides, the

10

employer promises nothing and remains free to change wages and all other working conditions without having to consult anyone and without anyone's agreement; and that the employer continues to have the absolute power to fire anyone with or without good cause.

*Woolley*, 99 N.J. at 309; *see also* Michael A. Chagares, *Utilization of the Disclaimer as an Effective Means to Define the Employment Relationship*, 17 Hofstra L. Rev. 365, 384 (1989) ("Employers wishing to confirm the terminable at-will status of their employees should include three components within their disclaimer: (1) that the employment relationship is terminable at the will of either party, (2) that it is terminable with or without cause, and (3) that it is terminable without prior notice."). The conspicuousness—or prominence—of a disclaimer "will always be a matter of law," and can be established in several ways. *Nicosia v. Wakefern Food Corp*., 136 N.J. 401, 412, 415 (1994). The disclaimer should be set off in a way that attracts attention, such as in a different font, a different color, or surrounded by a conspicuous border. *Id*. at 415 (citing *Jiminez v. Colo. Interstate Gas, Co*., 690 F. Supp. 977, 980 (D. Wyo. 1988); *Perry v. Sears, Roebuck & Co*., 508 So. 2d 1086, 1088 (Miss. 1987)).

Here, "no reasonable juror could reach other than one conclusion": Riverstone's Handbook did not create an enforceable obligation restricting Riverstone's right to discharge Torres at will. *Troy*, 186 N.J. at 366. Torres adverts to the discharge/dismissal provision, which she contends provides protection to Riverstone employees. (Opp'n Br. at 12.) That provision notwithstanding, the Handbook and Acknowledgment contain clear and conspicuous disclaimers that defeat the creation of any enforceable obligation. *See Woolley*, 99 N.J. at 285. The disclaimer in the Handbook is located on page 6, immediately following the table of contents and introduction. (Handbook at 6.) It is set off by the phrase "EMPLOYMENT AT WILL," which is printed in large, bold letters. (*Id.*) The Acknowledgment is a single piece of paper consisting of four paragraphs, the second of which repeats almost verbatim the same disclaimer that is

11

written in Handbook.  (Acknowledgment.)  Torres must have seen and read the

Acknowledgment, as she wrote her name both at the top and the bottom of it, and she also signed

it.  (*Id.*)

In addition, the language of the disclaimers is abundantly clear.  Both state that the

company does not make any promises by way of the Handbook, that the Company is free to

change any of its policies at any time, and that the company has the power to fire anyone with or

without cause.  *See Woolley*, 99 N.J. at 309.  In particular, the Handbook disclaimer states that "it

is the right of the Company and the Associate to terminate the employment relationship at any

time for any reason, with or without notice or cause."  (Handbook at 6; *see also*

Acknowledgment ("[T]he Company and I both have the right to terminate the employment

relationship at any time, for any reason, with or without cause or notice.").)  This language

differs significantly from the inadequate and confusing language recognized in other cases.  In

*Nicosia*, the defendant's disclaimer stated that "[t]he terms and procedures contained therein are

not contractual and are subject to change and interpretation at the sole discretion of the

Company, and without prior notice or consideration to any employee." 136 N.J. at 413.  The

New Jersey Supreme Court found this language—particular the terms "not contractual," "subject

to . . . interpretation," and "consideration"—to be "confusing legalese."  *Id.* at 414.  Similarly, in

*Preston*, the defendant's disclaimer stated, "It is the policy of the Company that this handbook

and the items contained, referred to, or mentioned herein, are not intended to create, nor should

be construed to constitute, a contract of employment between the Company and any one or all of

its personnel."  231 N.J. Super. at 87.  The Appellate Division found this language inadequate,

particularly in light of another provision in the handbook in which the employer professed to

offer employees "maximum job security."  *Id.*  And in *Geldreich v. American Cyanamid Co.*, the

Appellate Division found a disclaimer to be too generalized where it stated, "The information contained in the Personnel Policy Memoranda is solely for the guidance of personnel representatives and is not intended to create any contractual right or obligation, either expressed or implied." 299 N.J. Super. 478, 484, 486 (App. Div. 1997).

In contrast, the Riverstone disclaimers state in no uncertain terms that either Torres or the company could end her employment without notice or cause. They make clear in layman's terms that Riverstone "continues to have the absolute power to fire anyone with or without cause." *See Woolley*, 99. N.J. at 309. Indeed, Torres acknowledged at her deposition that she understood the disclaimer language to mean that "the company [could] terminate [her] employment at any time for any reason with or without notice." (Torres Dep. 76:5–8.) She also acknowledged that she knew she was an at-will employee and that she did not have a contract that stated she could not be terminated if she had a passing score on an audio shop. (*Id.* 9:15–18.) Moreover, the Handbook's discipline and termination provisions are not expressed in specific and broad language sufficient to give rise to an enforceable obligation. Whereas the manuals at issue in *Woolley* and *Preston* included detailed, progressive disciplinary procedures, *Woolley*, 99 N.J. at 287 n.2, *Preston*, 231 N.J. Super. at 86, the MAP program places discipline within the discretion of supervisors by employing permissive language. (Handbook at 49.) In addition, the Handbook explicitly states that the available MAP options "are not necessarily designed to be used in any particular order, and one or more steps may be bypassed depending on the severity of the situation." (Handbook at 49.) In addition, the Handbook provides that the existence of the MAP program does not preclude an employee's termination. (*Id.*) Taking the discipline and termination provisions together with the clear and prominent disclaimers, "no one reasonably could have thought [the Handbook] was intended to create legally binding obligations."

13

*Woolley*, 99 N.J. at 299.  Therefore, as a matter of law, the Handbook is not an enforceable

contract, and there is no basis for Torres's breach of contract claim.[3]  *See Martin v. Port Auth.*

*Transit Corp.*, 2010 WL 1257730, at *5 (D.N.J. Mar. 25, 2010) (holding that plaintiff who could

not point to an enforceable contract was an at-will employee).  As such, Riverstone is entitled to

summary judgment on Torres's breach of contract claim.

### C. Implied Covenant of Good Faith and Fair Dealing

It is well-settled law in New Jersey that a claim for breach of the implied covenant of

good faith and fair dealing requires the existence of a contract, whether express or implied.  *See*

*Wade v. Kessler Inst.*, 172 N.J. 327, 345 (2002) (holding that a contract must serve as the

predicate for a breach of the implied covenant of good faith and fair dealing); *Anderson v. DSM*

*N.V.*, 589 F. Supp. 2d 528, 534 (D.N.J. 2008) (Greenaway, J.) ("Plaintiff's claim for breach of

the implied covenant of good faith and fair dealing is dependent on the existence of a valid

employment contract.").  Because no contract exists, Torres's claim for breach of the implied

covenant of good faith and fair dealing fails.

### D. Misrepresentation

Torres's final claim is for "misrepresentation."  She asserts that Riverstone, through

Geitz, made the following representations: (1) that 80% was a passing score for an audio shop

test and she could not be terminated for receiving a passing score; and (2) that the July 10, 2009,

written advisory was a tool for guidance and not a disciplinary action.  (Compl. Count 3 ¶ 2.)

She contends that despite these representations, Riverstone fired her for scoring an 81.3%.  (*Id.*)

---

[3] Torres briefly argues that a contract could also exist on the basis of Riverstone's purported policy of not terminating employees even if they score less than 80% on an audio shop.  (Opp'n Br. at 21.)  While a policy expressed by means other than an employee manual, such as an oral promise only to terminate an employee for cause, can in some situations be enforceable, *see Shebar v. Sanyo Bus. Sys. Corp.*, 218 N.J. Super. 111, 120–21 (App. Div. 1987), Torres stated at her deposition that no one ever told her that she would not be terminated if she got a passing score on an audio shop, and she also testified that there is no Riverstone policy that states that an employee who gets a certain score on an audio shop cannot be terminated.  (Torres Dep. 9:11–10:17, 12:4–7.)

The language in her complaint suggests claims of both negligent misrepresentation and fraudulent misrepresentation.  She repeatedly refers to Riverstone's "negligent misrepresentations," but also claims that Riverstone "made the material misrepresentations and concealed facts with the knowledge of the falsity of the representations made, with the intent to induce plaintiff to rely upon such representations," allegations strongly suggesting a claim of fraudulent misrepresentation.  (Compl. Count 3 ¶¶ 2–3.)  The parties' briefs do not clear up the matter.  (Moving Br. at 12; Opp'n Br. at 21.)  In the interest of comprehensiveness, the Court analyzes both theories.

To succeed on a fraudulent misrepresentation claim, a plaintiff must establish the following elements: "(1) a material misrepresentation of a presently existing or past fact; (2) made with knowledge of its falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; (4) reliance on the misrepresentation, and (5) damage to the party who relied on the misrepresentation."  *First Valley Leasing, Inc. v. Goushy*, 795 F. Supp. 693, 701 (D.N.J. 1992) (Fisher, J.).  A negligent misrepresentation, on the other hand, is "an incorrect statement, negligently made and justifiably relied on," that "may be the basis for recovery of damages for economic loss sustained as a consequence of that reliance."  *H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334 (1983), *aff'd in part and vacated in part*, 751 F.2d 628 (3d Cir. 1984).

With regard to both claims, the record shows that Torres cannot clear the first hurdle: neither Riverstone nor Geitz misrepresented any fact to her.  At her deposition, Torres stated that Geitz never told her that she would not be terminated if she got a score higher than 80%.  (Torres Dep. 12:4–7.)  She testified that no one had promised her that she would not be terminated if she received a passing score, and she added that she did not think any company policy stated that she

15

would not be terminated if she received a passing score.  (*Torres Dep.* 9:11–14.)  Furthermore, the meeting agenda in which Geitz referenced the 80% standard states only that "[s]cores below 80% [on an audit] will require a MAP" and that "all scores [on shop reports] below 80% require a verbal[;] a repeat score under 80% is a MAP." (Aug. 6, 2009, Meeting Agenda.)  It does not represent that employees who score above an 80% are immune to termination.  Nor does the email Geitz sent to Torres after her first poor audio shop report.  In that email, Geitz merely stated that Torres's performance "does not meet the Riverstone standard of 80%." (Emails of Aug. 31, 2009.)  While the portion of Torres's August 17, 2009, written advisory stating that "[i]t is a requirement of her position to receive an 80% or above" could be interpreted to mean that 80% is a passing score, the advisory does not indicate that Torres could not be terminated if she scored higher than an 80%.  (Aug. 17, 2009, Written Advisory.)  Even if Riverstone represented that an 80% was a passing score, Torres did not "justifiably rel[y]" upon that representation; she admitted that she knew it did not protect her from termination.  (Torres Dep. 9:11–14.)

The second misrepresentation Torres alleges relates to an email Geitz sent to her on July 10, 2010, stating that Torres should use a written advisory as a "guideline for Performance Improvement." (July 10, 2009, Email from Geitz to Torres, attached to Roberts Certif. as Ex. 6.) However, Torres does not point to any facts suggesting that this statement was false or that Geitz or anyone else told her the written advisory was not a disciplinary measure.

Based on the evidence in the record, no reasonable jury could find that any Riverstone representative made any misrepresentation or incorrect statement to Torres.  Therefore, Riverstone is entitled to summary judgment on Torres's claims of fraudulent and negligent misrepresentation.

16

**III. Riverstone's Motion for Sanctions**

In addition to its motion for summary judgment, Riverstone moves for sanctions under both Rule 11 of the Federal Rules of Civil Procedure and 28 U.S.C. § 1927.  According to Riverstone, Torres's counsel violated Rule 11 by filing "a frivolous suit without conducting a reasonable inquiry into the facts and law, and then fail[ing] to dismiss the claims after learning they were not viable."  (Sanctions Moving Br. at 1.)  Additionally, Torres's counsel purportedly violated § 1927 by "'unreasonably and vexatiously' multipl[ying] the proceedings."  *Id*. Riverstone seeks "reasonable expenses, including attorneys' fees."  *Id*.

Sanctions under Rule 11 are appropriate only in the "'exceptional circumstance' where a claim or motion is patently unmeritorious and frivolous."  *Doering v. Union Cnty. Bd. of Chosen Freeholders*, 857 F.2d 191, 194 (1988) (citing *Gaiardo v. Ethyl Corp*., 835 F.2d 479, 483 (3d Cir. 1987)).  Though a showing of bad faith is not required, sanctions should be imposed only when it is "patently clear that a claim has absolutely no chance of success."  *Lieb v. Topstone Indus. Inc*., 788 F.2d 151, 157 (3d Cir. 1986); *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2nd Cir. 1986) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 254 (2nd Cir. 1985)).  A court must examine whether counsel's conduct was "reasonable[] under the circumstances," and ask whether counsel had "objective knowledge or belief at the time of filing . . . that the claim was well grounded in law and fact."  *Ford Motor Co. v. Summit Motor Prods., Inc*., 930 F.2d 277, 289 (3d Cir. 1991) (internal citations omitted).

Pursuant to 28 U.S.C. § 1927, sanctions should be imposed when counsel "multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927 (1980).  In the Third Circuit, "sanctions may not be imposed under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal."

*LaSalle Nat'l Bank v. First Conn. Holding Grp., L.L.C. XXIII*, 287 F.3d 279, 289 (3d Cir. 2002). To be deserving of sanctions, counsel's conduct must be "of an egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of litigation." *Id.* (quoting *Baker Indus. Inc. v. Cerberus Ltd.*, 784 F.2d 204, 208 (3d Cir. 1985)). The critical difference between sanctions under Rule 11 and § 1927 is that the latter requires a showing of bad faith.

In this case, it would be inappropriate to sanction Torres's counsel under either Rule 11 or § 1927. Rule 11 sanctions are not warranted because counsel presented a colorable claim that the Handbook created an implied employment contract. *See Mellon Bank Corp. v. First Union Real Estate Equity & Mortg. Inv.*, 951 F.2d 1399, 1413–14 (3d Cir. 1991). Sanctions under § 1927 are also unwarranted because there is no showing that counsel acted in bad faith or in an egregious manner. Every counsel has an obligation to "represent his client zealously," and imposing sanctions under this statute may have an "undesirable chilling effect" on that obligation. *Ford v. Temple Hosp.*, 790 F.2d 342 (3d Cir. 1986).

## IV. Conclusion

For the foregoing reasons, Riverstone's motion for summary judgment is granted, and its motion for sanctions is denied. An appropriate order will be entered.

/s/ Katharine S. Hayden

September 9, 2011                    Katharine S. Hayden, U.S.D.J.